IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

**JOSE CRUZ GONZALES,**

Petitioner,

v.

**TIM VIRGA,**

Respondent.

Case No. **1:12-cv-01536 AWI MJS (HC)**

**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner filed the instant petition for writ of habeas corpus on December 17, 2014. It appears from the face of the Petition and the attachments thereto that Petitioner is in custody of the County while awaiting criminal proceedings in Fresno County Superior Court.

I.    **PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Stanislaus, following his conviction by jury trial on December 23, 2008, of first degree murder with a use of a firearm. (Clerk's Tr. at 697-98.) On April 16, 2009, Petitioner was sentenced to

1

1  an indeterminate term of fifty (50) years to life in state prison. (Id.)

2      Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

3  District on October 26, 2010. (Lodged Docs. 2-4.) The appeal was denied on August 11,

4  2011. (Lodged Doc. 1.) On September 23, 2011, Petitioner filed a petition for review with

5  the California Supreme Court. (Lodged Doc. 5.) The petition was summarily denied on

6  November 16, 2011. (Lodged Doc. 6.)

7      On September 5, 2012, Petitioner filed a petition for writ of habeas corpus with the

8  Stanislaus County Superior Court. (Lodged Doc. 7.) The petition was dismissed by way

9  of a reasoned opinion on September 21, 2012. (Lodged Doc. 8.) Petitioner proceeded to

10  file petitions for writ of habeas corpus with the California Court of Appeal and the

11  California Supreme Court. Both petitions were summarily dismissed. (See Lodged Docs.

12  9-12.)

13      Petitioner filed his federal habeas petition on September 19, 2012. (Pet., ECF No.

14  1.) The petition raised five different claims for relief, listed as follows:

15      1)  Trial counsel was ineffective because of a conflict of interest with his employer;

16      2)  Petitioner was constructively denied counsel at critical stages of the case;

17      3) Petitioner's right to counsel was denied as counsel's office had represented

18          nearly all the state's witnesses;

19      4) The trial court violated Petitioner's right to counsel in denying his Marsden

20          motion; and

21      5) Petitioner's right to counsel was violated when the court denied Petitioner a

22          continuance to seek new counsel.

23  (Pet. at 4-6, ECF No. 1.)

24      Respondent filed an answer to the petition on September 5, 2013, and Petitioner

25  filed a traverse on December 9, 2013. (Answer & Traverse, ECF Nos. 18, 22.) The

26  matter stands ready for adjudication.

27

28

2

**II.**   **STATEMENT OF THE FACTS[1]**

FACTUAL AND PROCEDURAL SUMMARY

The Information

Gonzales was charged with first degree murder (§§ 187, 189) in the death of Cox. The information also alleged enhancements for personal use of a firearm resulting in great bodily injury or death (§ 12022.53, subd. (d)) and for committing the crime for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). Finally, the information alleged Gonzales was subject to a term of life in prison without the possibility of parole because he was an active member of a criminal street gang and he committed the crime to further the activities of the criminal street gang. (§ 190.2, subd. (a)(22).)

Prosecution's Case

Beginning in the late afternoon of Sunday, August 28, 2005, Sandra Montes Herrera and Bryan Scott Sanders hosted a party at their residence. Cox and Gonzales both attended the party. Herrera did not consume any alcohol or drugs at the party because she was pregnant. Later that evening, Cox, Gonzales, and a third man, later identified as Dale Daniels, left the party in a vehicle. Several hours later, only Daniels and Gonzales returned in the vehicle. Herrera heard Gonzales say that he "did it." Prior to that night, Herrera had heard Gonzales state that there were rumors that Cox was a snitch.

Sanders confirmed there had been a party at his house on August 28, 2005, and that Cox and Gonzales had attended. Sanders saw Cox leave with Gonzales and Daniels, but only Gonzales and Daniels returned later that night. Sanders had spoken with Gonzales a few days before the party. At that time, Gonzales told Sanders that he thought Cox might be a snitch and needed to be "taken care of." The night of the party Gonzales asked Sanders for a "throw-away" gun, i.e., a gun that could be thrown away after it was used.

Daniels testified he attended the party at Sanders's house. Daniels and his brother-in-law, Paul Lopez, drove to the party in Lopez's vehicle. Cox and Gonzales also attended the party. A few hours after arriving at the party, Daniels left the party with Cox and Gonzales to take Cox home. Daniels drove on back roads utilizing directions given to him by both Cox and Gonzales. Daniels pulled over to the side of the road near a canal so that all three men could urinate. Cox and Gonzales walked a short distance away from Daniels. While Daniels was urinating, he heard four or five gunshots and he immediately ran back to the vehicle. He heard Gonzales yell at him to get into the car. Daniels drove off as soon as Gonzales got into the vehicle. Daniels drove back to the party, returned the keys to Lopez, and then left the party. He did not tell anyone what had occurred because he was afraid.

---

[1] The Fifth District Court of Appeal's summary of the facts in its August 11, 2011 opinion is presumed correct. 28 U.S.C. § 2254(e)(1).

In the late night hours of August 28, 2005, Trisha Lynn Winters was lying in bed when she heard five to six gunshots. Winters's mother also heard the gunshots.

On August 30, 2005, at approximately 8:30 in the morning, an employee of a local farm discovered Cox's body floating in a canal. The canal is located near the Winters residence.

Detectives discovered six shell casings, a small folding knife, and scuff marks, as if someone had been dragged along the canal, approximately one-half mile from where the body was recovered. Another shell casing was found on the roadway a short distance from the location. All of the shell casings were .380-caliber, and three of the casings were manufactured by Cascade Cartridge, Inc. In addition, three other shell casings of a different caliber were discovered in this area.

Forensic examination of Cox revealed four gunshot wounds, two of which would have caused death within minutes, and one of which would have caused death within a matter of hours if untreated. The condition of the body was consistent with extended exposure to water. The pathologist testified that the condition of the body at the examination was consistent with the body having been put into the canal on the night of August 28, 2005, with a time of death in the late night of that date. Four bullets were recovered during the autopsy.

In the early morning hours of August 29, 2005, police officers from the Modesto Police Department were dispatched to Sanders's residence after receiving a report that shots had been fired at the residence. At least six marked police vehicles responded to the scene. As officers approached the residence, they observed Gonzales standing in front of the house. The officers identified themselves and ordered Gonzales to stop. Initially, Gonzales obeyed the officers' orders, but after a few moments he ran into the residence. Officers then used the public address system inside one of their vehicles to order the occupants to come out of the residence. Gonzales came out of the residence in a relaxed manner and complied with the officers' orders. When officers searched the residence, they located a handgun in the tank of one of the toilets.

Sanders was inside the residence when the police approached. He heard Gonzales enter the house, say he had a gun, and that the gun was hot. Sanders then observed Gonzales exit the bathroom and go outside.

Testing determined that three of the .380-caliber casings found at the crime scene were fired from the gun recovered at Sanders's residence and the other .380-caliber casings found could have been fired from this gun. The bullets recovered from the victim's body also were compared with bullets test fired by a criminalist. The criminalist was unable to identify the bullets as having been fired from the recovered weapon because the barrel of the weapon appeared to have been altered mechanically.

Jennifer Delores Rodriguez had had a romantic relationship with the victim for approximately eight years. Rodriguez last spoke with Cox by phone two or three days before his body was recovered from the canal.

Cameron Robert Miller was a friend of the victim's. He last saw the

4

victim three to four days before the body was recovered.

Several months after Cox's body was discovered, Gonzales called Herrera and told her an investigator was going to interview her about Cox. Gonzales told Herrera to tell the investigator that he (Gonzales) and Cox were friends.

At trial, Ramona Casioce admitted that she dated Gonzales in 2005 and that she had spoken with detectives about Cox's murder. She denied, however, that Gonzales ever made any incriminating statements to her or that she told detectives that he had done so.

A recording of Casioce's statement to detectives was played to the jury. In the statement, Casioce told detectives that Gonzales had stated he had dumped Cox's body into the canal because Cox owed Sanders $1,000. Gonzales also said that Cox's head had been removed from his body. Gonzales said it was fun dumping Cox's body into the canal. Gonzales also said that he needed to dispose of some bullets from the same box as those that were used in the killing. When Casioce indicated she did not believe Gonzales, he showed her a newspaper article reporting that a body had been recovered from a canal. Gonzales also stated he had killed Cox, but claimed he was joking. Generally, Gonzales stated that another person had killed Cox.

At trial, Rosa Hernandez Perez could not recall anything about the events surrounding Cox's death. She had been arrested in 2005, however, and at that time told detectives that Gonzales admitted to her that he had killed Cox because he believed Cox was a snitch. Her interview with detectives was recorded and was played to the jury.

Defense Witnesses

Robert Don Lawerence, M.D., a pathologist, reviewed the autopsy of Cox. He opined that Cox's body had been in the water at least eight to 10 days, perhaps longer.

Turhon Murad, Ph.D., is a physical anthropologist. He performed an experiment in an attempt to determine how long the hands of a body would need to be submerged before the skin would peel off, as was the case with Cox's hands. Murad opined that this condition could not develop within 36 hours, but likely would take between 146 and 161 hours.

The Verdict and Sentencing

The jury convicted Gonzales of first degree murder and found he personally used a firearm during the commission of the crime, resulting in great bodily injury within the meaning of section 12022.53, subdivision (d). The jury, however, found the crime was not committed for the benefit of a criminal street gang and that Gonzales was not an active participant in a criminal street gang at the time the crime was committed.

The trial court imposed consecutive sentences of 25 years to life for the murder and the firearm enhancement.

People v. Gonzales, 2011 Cal. App. Unpub. LEXIS 6079, 2-9 (Cal. App. 5th Dist. Aug. 11, 2011).

II.     **DISCUSSION**

A.     **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

B.     **Legal Standard of Review**

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

1.     Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that

6

1   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

2   that are materially indistinguishable from" a Supreme Court case, yet reaches a different

3   result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06.

4   "AEDPA does not require state and federal courts to wait for some nearly identical

5   factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

6   even a general standard may be applied in an unreasonable manner" Panetti v.

7   Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

8   "clearly established Federal law" requirement "does not demand more than a 'principle'

9   or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state

10  decision to be an unreasonable application of clearly established federal law under §

11  2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

12  (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-

13  71 (2003).  A state court decision will involve an "unreasonable application of" federal

14  law only if it is "objectively unreasonable."  Id. at 75-76, quoting Williams, 529 U.S. at

15  409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

16  Court further stresses that "an *unreasonable* application of federal law is different from

17  an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011), (citing Williams, 529

18  U.S. at 410) (emphasis in original).   "A state court's determination that a claim lacks

19  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

20  correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541

21  U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

22  have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S.

23  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

24  Federal law for a state court to decline to apply a specific legal rule that has not been

25  squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

26  (2009), quoted by Richter, 131 S. Ct. at 786.

27           2.      Review of State Decisions

28       "Where there has been one reasoned state judgment rejecting a federal claim,

7

1   later unexplained orders upholding that judgment or rejecting the claim rest on the same

2   grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

3   "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

4   (9th Cir. 2006).   Determining whether a state court's decision resulted from an

5   unreasonable legal or factual conclusion, "does not require that there be an opinion from

6   the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85.

7   "Where a state court's decision is unaccompanied by an explanation, the habeas

8   petitioner's burden still must be met by showing there was no reasonable basis for the

9   state court to deny relief."  Id. ("This Court now holds and reconfirms that § 2254(d) does

10  not require a state court to give reasons before its decision can be deemed to have been

11  'adjudicated on the merits.'").

12        Richter instructs that whether the state court decision is reasoned and explained,

13  or merely a summary denial, the approach to evaluating unreasonableness under §

14  2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

15  or theories supported or, as here, could have supported, the state court's decision; then

16  it must ask whether it is possible fairminded jurists could disagree that those arguments

17  or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786.

18  Thus, "even a strong case for relief does not mean the state court's contrary conclusion

19  was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

20  authority to issue the writ in cases where there is no possibility fairminded jurists could

21  disagree that the state court's decision conflicts with this Court's precedents."  Id.  To put

22  it yet another way:

23        As a condition for obtaining habeas corpus relief from a federal
          court, a state prisoner must show that the state court's ruling on the claim
24        being presented in federal court was so lacking in justification that there
          was an error well understood and comprehended in existing law beyond
25        any possibility for fairminded disagreement.

26  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

27  are the principal forum for asserting constitutional challenges to state convictions." Id. at

28  787. It follows from this consideration that § 2254(d) "complements the exhaustion

8

1  requirement and the doctrine of procedural bar to ensure that state proceedings are the

2  central process, not just a preliminary step for later federal habeas proceedings." Id.

3  (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

4                    3.      Prejudicial Impact of Constitutional Error

5           The prejudicial impact of any constitutional error is assessed by asking whether

6  the error had "a substantial and injurious effect or influence in determining the jury's

7  verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

8  U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

9  state court recognized the error and reviewed it for harmlessness).  Some constitutional

10 errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v.

11 Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

12 (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective

13 assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

14 Strickland prejudice standard is applied and courts do not engage in a separate analysis

15 applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin

16 v. Lamarque, 555 F.3d at 834.

17 **III.     REVIEW OF PETITION**

18      **A.      Claims 1-4: Ineffective Assistance of Counsel**

19          Petitioner, in his first four claims, presents various claims that his right to effective

20 assistance of counsel was violated.   In his first claim, he contends that his right to

21 effective assistance was violated because his attorney had represented the interests of

22 his employer, the public defender's office, not Petitioner. Specifically, Petitioner alleges

23 that counsel failed to move to withdraw, that the policies of counsel's employer impeded

24 his right to investigate and make a defense, and that counsel failed to inform Petitioner

25 of his conflicts with his office. In his second claim, Petitioner claims that counsel

26 constructively abandoned him in during the investigation phase and Marsden hearings.

27 In his third claim, Petitioner contends that counsel had a conflict of interest because

28 counsel's office previously represented nearly all of the state's witnesses. And finally, in

1    his fourth claim, Petitioner alleges that the trial court violated his right to effective counsel

2    by denying his <u>Marsden</u> motion.

3                            1.    <u>State Court Decision</u>

4            Petitioner presented these claims by way of direct appeal to the California Court

5    of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

6    appellate court and summarily denied in subsequent petition for review by the California

7    Supreme Court. (<u>See</u> Lodged Docs. 1, 6.) Because the California Supreme Court's

8    opinion is summary in nature, this Court "looks through" that decision and presumes it

9    adopted the reasoning of the California Court of Appeal, the last state court to have

10   issued a reasoned opinion. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804-05 & n.3 (1991)

11   (establishing, on habeas review, "look through" presumption that higher court agrees

12   with lower court's reasoning where former affirms latter without discussion); <u>see also</u>

13   <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look

14   to last reasoned state court opinion in determining whether state court's rejection of

15   petitioner's claims was contrary to or an unreasonable application of federal law under

16   28 U.S.C. § 2254(d)(1)).

17          In denying Petitioner's claim, the California Court of Appeal explained:

18   **DISCUSSION**

19   **I. Conflict of Interest**

20          Gonzales claims that trial counsel had a conflict of interest that
21   compromised trial counsel's loyalty to him, resulting in a violation of his
     constitutional right to an attorney. (<u>People v. Rundle</u> (2008) 43 Cal.4th 76,
22   168, disapproved on other grounds in <u>People v. Doolin</u> (2009) 45 Cal.4th
     390, 421, fn. 22 (<u>Doolin</u>).)

23          Gonzales's claims stem from several comments made on the
24   record. Gonzales originally was represented by an attorney who became
     seriously ill, thus requiring appointment of a new attorney. The public
25   defender's office was appointed to represent Gonzales. Trial counsel was
     an employee of the public defender's office. At what appears to be the
26   initial hearing attended by trial counsel, he stated that his office had not
     yet completed its conflicts check, but Gonzales claimed that the public
27   defender's office had represented two of the "star witnesses" against him.
     The identity of the star witnesses is not in the record.

28          At a status hearing two weeks later, trial counsel explained that he

had not completed a conflicts check because Gonzales's prior attorney had not provided the discovery in the case. Once again, trial counsel stated that Gonzales claimed the public defender's office had a conflict that would prevent it from representing Gonzales. Trial counsel informed the trial court he could neither confirm nor deny whether a conflict existed.

The next hearing at which a possible conflict was discussed occurred six months later when Gonzales made a motion pursuant to People v. Marsden (1970) 2 Cal.3d 118 (Marsden). At the hearing, Gonzales stated that one of the reasons he needed new appointed counsel was because the public defender's office had represented some of the witnesses in the case. Gonzales identified Casioce and Perez as two witnesses who had been represented by the public defender's office. Trial counsel stated he was unsure whether any conflict existed and was instructed by the trial court to resolve the issue. Also, Sanders mentioned he was represented by the public defender's office at one point as the result of charges that arose out of the search of his house (during which the handgun used to murder Cox was discovered).

After the verdict had been reached, Gonzales again made a Marsden motion. He asserted trial counsel was ineffective because, among other reasons, the public defender's office had represented some of the witnesses in the case. Trial counsel explained that his office had represented "just about everybody who testified except Bryan Sanders." The public defender's office concluded that there was no conflict because the representation of the witnesses occurred in unrelated matters, and none of the witnesses remained on probation. Trial counsel explained that his office decided whether a conflict existed, not him personally. He then mentioned that "at the time I was involved in a labor dispute issue of sorts with regards to" the conflict issue.

Gonzales argues this record establishes that trial counsel acted throughout trial under a conflict of interest, requiring reversal of the judgment. Reversal is required, according to Gonzales, because he should be afforded a presumption of prejudice because of "the number of witnesses affected by the conflict of interest."

In Mickens v. Taylor (2002) 535 U.S. 162 (Mickens), the Supreme Court of the United States explained that under the United States Constitution a claim that trial counsel acted while under a conflict of interest was a species of ineffective assistance of counsel and, generally, the issue was governed by the rule of Strickland v. Washington (1984) 466 U.S. 668, 685-686: A defendant must establish a reasonable probability that the result of the proceeding would have been different if counsel had not been deficient. (Mickens, at p. 166.) The Supreme Court also noted an exception to this general rule where assistance of counsel has been denied entirely or during a critical stage of the proceedings. (Ibid.) Under such circumstances, prejudice is presumed and reversal is required. (Ibid.)

The presumption of prejudice also has been applied by the Supreme Court where a defendant's attorney "actively represented conflicting interests." (Mickens, supra, 535 U.S. at p. 166.) The issue in Mickens was whether the presumption of prejudice standard should be applied where the trial court "fails to inquire into a potential conflict of interest about which it knew or reasonably should have known."[fn2] (Id. at p. 164.) Since trial counsel had not asserted to the trial court that he could

11

not represent multiple defendants, the Supreme Court concluded that the defendant was required to establish that the conflict of interest adversely affected trial counsel's performance. (Id. at pp. 173-174.)

**FN2**: The alleged conflict of interest arose because at the time the defendant murdered the victim, one of the attorneys appointed to represent the defendant also represented the victim in an unrelated criminal matter. Trial counsel did not view the situation as creating a conflict of interest because the victim was dead and counsel no longer represented him. (Mickens, supra, 535 U.S. at pp. 164-165.) The Supreme Court limited its holding to the standard of review when the trial court had a duty to inquire. Whether such a duty existed in the case was not addressed. (Id. at p. 174.)

At the time Mickens was before the Supreme Court, California recognized not only the federal right to conflict-free counsel, but also an independent right under the California Constitution to conflict-free counsel. (Cal. Const., art. I, § 15; Rundle, supra, 43 Cal.4th at p. 174.) California also had established a more stringent test under the California Constitution. "Although the federal Constitution—regardless of whether a presumption of prejudice applies—requires proof of an actual conflict of interest, that is, proof that counsel's conflict adversely affected his or her performance during the proceedings [citation], under the state Constitution we have required only that the record support an 'informed speculation' that a 'potential conflict of interest' impaired the defendant's right to effective assistance of counsel. [Citations.]" (Rundle, at pp. 174-175.)

These different standards were addressed by the California Supreme Court in Doolin, supra, 45 Cal.4th 390.

The Supreme Court began by noting the general rule under both constitutions that a defendant was entitled to representation by counsel who was "free from any conflict of interest that undermines counsel's loyalty to his or her client. [Citations.]" (Doolin, supra, 45 Cal.4th at p. 417.) "'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests. [Citation.]"' [Citations.]" (Ibid.)

The Supreme Court next noted that Mickens confirmed that a conflict of interest under the federal Constitution was a category of ineffective assistance of counsel claims that, as a general rule, required a defendant to prove (1) counsel's performance was deficient, and (2) there was a reasonable probability that the result of the proceeding would have been different if counsel had performed adequately. (Doolin, supra, 45 Cal.4th at p. 417.) "In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest 'that affected counsel's performance— as opposed to a mere theoretical division of loyalties.' [Citations.] '[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect.' [Citation.] 'An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.' [Citation.]" (Id. at pp. 417-418.)

The Supreme Court also observed that it previously had concluded that one way to establish whether the conflict of interest adversely affected

12

trial counsel's performance under the federal standard was to determine if trial counsel "'"pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are ... bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' [Citation.]" (Doolin, supra, 45 Cal.4th at p. 418.)

The Supreme Court then turned to the prejudice requirement. It recognized that where trial counsel actively represented conflicting interests, both the federal and state Constitutions applied a presumption of prejudice. (Doolin, supra, 45 Cal.4th at p. 418.) In most instances, however, the Sixth Amendment "requires a defendant to show ... a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different. [Citations.]" (Doolin, at p. 421.)

After a thorough analysis of decisions under the state Constitution, the Supreme Court rejected the separate state standard. "Upon close examination of the federal standard and our own, we discern no ultimate substantive difference between the two. Our elusive and somewhat varied application of our state standard over the past four decades, moreover, strongly suggests that our informed speculation formulation is too amorphous to provide meaningful guidance to either the bench or bar. [¶] We therefore conclude that employing both standards is unnecessary and confusing. In the final analysis, both standards involve a consideration of prejudice in the outcome. The federal constitutional approach zealously protects a criminal defendant's constitutional right to conflict-free counsel. The federal articulation of the constitutional requirements is clear and provides a more meaningful framework for review. Today, we therefore harmonize California conflict of interest jurisprudence with that of the United States Supreme Court and adopt the standard set out in Mickens." (Doolin, supra, 45 Cal.4th at p. 421.)

These two cases set forth the analysis we must employ in analyzing Gonzales's claim. Gonzales must demonstrate (1) trial counsel's performance was deficient because he labored under a conflict of interest that adversely affected his performance, and (2) he (Gonzales) suffered prejudice, either because prejudice is presumed or because there is a reasonable probability that the result of the trial would have been different if counsel had not had a conflict. We conclude that Gonzales cannot meet either requirement.

First, Gonzales cannot establish a conflict of interest existed. Nor can he establish that the alleged conflict adversely affected trial counsel's performance. We have summarized all of the evidence on the issue. While trial counsel stated that his office had represented most of the witnesses at some point, the most significant statement was his office's conclusion that no conflict of interest existed because it did not represent any of the witnesses at the time. Nor is there any evidence in the record that trial counsel personally had represented any of the witnesses.

This issue was addressed in three relevant cases. In People v. Cox

(2003) 30 Cal.4th 916,[fn3] the defendant argued that his conviction must be reversed because both of his attorneys previously had represented witnesses in the proceeding. The record indicated that one of the attorneys was employed by the public defender's office. The public defender's office had represented one potential witness in an unrelated matter, but that witness agreed to waive any possible privilege and subject herself to cross-examination on any communications between the witness and her attorney from the public defender's office. This trial counsel also had declared a conflict and refused to represent another potential witness in the case. (Id. at p. 947.)

FN3: Disapproved on other grounds in Doolin, supra, 45 Cal.4th at page 421, footnote 22.

Defendant's second attorney was appointed to represent one of the witnesses in the case, but was replaced and represented to the trial court that he had had no contact with the potential witness. Another potential witness had been represented by the second attorney's firm, but the second attorney represented to the court that he had not had any contact with the potential witness. A third witness also had been represented by another member of the second attorney's firm, but the firm no longer represented her. (Cox, supra, 30 Cal.4th at pp. 947-948.)

The Supreme Court began its analysis by observing that "[a] conflict may arise if a former client is a witness in a new case because the attorney is forbidden to use against a former client any confidential information acquired during that attorney-client relationship. [Citations.] [¶] But if the attorney possesses no such confidential information, courts have routinely held that no actual or potential conflict of interest exists." (Cox, supra, 30 Cal.4th at p. 949.)

Applying these principles, the Supreme Court rejected defendant's claim. "[D]efendant has made no showing that an actual or potential conflict existed that adversely affected counsel's performance. Instead, defendant makes only the conclusory assertion that defense counsel could not effectively cross-examine witnesses ... as to the 'circumstances of the charges upon which counsel formerly represented them.' Defendant makes no claim that defense counsel could not effectively cross-examine these witnesses as to their testimony in the current case, nor does he assert that defense counsel even possessed confidential information acquired during the former representation." (Cox, supra, 30 Cal.4th at p. 950.)

Similarly, Gonzales has not made any showing of an actual conflict, or even a potential conflict, that adversely affected trial counsel's performance. There is nothing in the record to show that the public defender's prior representation of these witnesses prevented trial counsel from effectively cross-examining these witnesses, or that trial counsel possessed any confidences from any of the witnesses.

A similar claim was made in Rhaburn v. Superior Court (2006) 140 Cal.App.4th 1566 (Rhaburn). In this case, the district attorney moved to disqualify the public defender's office because it had represented one of the witnesses in an unrelated matter that could be used to attack the witness's credibility. The prior representation occurred seven years before the trial in this case. Trial counsel opposed the motion, noting (1) the

1
2
3
4

record of the witness's case was not stored in the office; (2) he had been instructed not to inquire about the case; (3) he did not work for the public defender when the case was defended; and (4) his ability to cross-examine the witness was not compromised. A declaration also was submitted by another attorney in the public defender's office stating that he had reviewed the witness's file and it contained no relevant confidences. (Id. at p. 1570.)

5
6
7
8
9
10

The appellate court concluded that a rule of automatic disqualification because the public defender's office previously represented a witness in a case was unjustified. (Rhaburn, supra, 140 Cal.App.4th at p. 1581.) Because trial counsel did not have a direct and personal relationship with the witness, direct acquisition of confidential information should not be presumed. (Ibid.) Instead, the trial court "should evaluate the totality of the circumstances in determining whether there is a reasonable possibility that the individual attorney representing defendant either has obtained confidential information about the witness collected by his or her office, or may inadvertently acquire such information through file review, office conversation, or otherwise." (Ibid.)

11
12
13
14

It is significant that the issue in Rhaburn arose when the trial court granted the prosecution's motion to recuse counsel. While the process described in Rhaburn is appropriate when evaluating such a motion, we do not suggest the procedure should be utilized in a case such as this, where no one suggests a conflict existed. Rhaburn is relevant to Gonzales's argument because it establishes that a conflict does not automatically exist simply because the public defender's office represented a witness in a prior action.

15
16
17
18
19

The third relevant case is People v. Lopez (2008) 168 Cal.App.4th 801 (Lopez). Trial counsel was employed by the public defender's office. During trial, it was discovered that one of the witnesses recently had been represented by the public defender's office. After discussing the matter with his office, trial counsel informed the trial court that it had been determined a conflict did not exist. The defendant objected and requested new appointed counsel because of the asserted conflict of interest. The trial court disagreed and the trial resulted in defendant's conviction of murder.

20
21
22
23
24
25
26
27
28

This court rejected the defendant's claim that trial counsel had a conflict of interest that rendered his representation ineffective. "First, no showing is in the record that [trial counsel] obtained any confidential information from [the witness]. Second, a justification 'for declining to apply a rigid presumption [of possession of confidential information]' in the context of representation by the public defender's office 'is that "[u]nlike their private sector counterparts, public sector lawyers do not have a financial interest in the matters on which they work"' so '"they may have less, if any, incentive to breach client confidences."' [Citation.] Third, since [trial counsel] never had 'a "direct and personal" relationship' with [the witness], whom a former colleague no longer with the public defender's office once represented, 'the courts should normally be prepared to accept the representation of counsel, as an officer of the court, that he or she has not in fact come into possession of any confidential information acquired from the witness and will not seek to do so.' [Citation.] ... [¶] To obtain relief on appeal, the defendant must show either an actual conflict that adversely affected counsel's performance [citation] or informed

speculation with a factual basis in the record about a potential conflict that adversely affected counsel's performance [citation] and an abuse of discretion by the trial court in denying his or her motion to disqualify counsel [citation]. Since none appears here, [defendant] fails to discharge his burden on appeal." (Lopez, supra, 168 Cal.App.4th at p. 809.)

Essentially, we are in the same position as Lopez, except that an informed speculation of a conflict is no longer an acceptable method of establishing a conflict of interest. Nothing in the record suggests that trial counsel had a conflict with any of the witnesses. Instead, Gonzales asks us to presume there must be some conflict because of the prior representation. Normally, as explained in Lopez, we accept the representation of trial counsel that no conflict existed. The absence of any evidence to suggest this representation was false compels that we accept it. Gonzales has failed to establish that a conflict existed, thus compelling rejection of his argument.

Also, Gonzales has failed to present any evidence that the claimed conflict adversely affected trial counsel's performance. Indeed, Gonzales does not even address the issue, instead apparently assuming trial counsel's performance was adversely affected. We cannot find in the record any evidence to support Gonzales's assumption. Trial counsel thoroughly cross-examined every witness. Nothing in the record suggests he pulled his punches or failed to pursue a defense because of confidential information he allegedly possessed.

Finally, had Gonzales successfully established that trial counsel had a conflict of interest that adversely affected his performance, we would reject this claim because Gonzales cannot establish any prejudice as a result of the allegedly deficient performance. Gonzales urges us to apply a presumption of prejudice, but we reject such an assertion.

As our review of the cases establishes, generally, the defendant arguing his attorney was conflicted bears the burden of establishing that there is a reasonable probability he would have obtained a better result if his attorney had not had a conflict of interest. Gonzales does not argue this standard, and our review of the record does not reveal any support for such an argument had it been made.

Moreover, Gonzales cannot establish that a presumption of prejudice should be utilized in this case. A presumption of prejudice is appropriate where the defendant is denied counsel entirely or at a critical stage of the proceedings, or in some cases where trial counsel undertakes to represent more than one defendant in the same trial. (Mickens, supra, 535 U.S. at p. 166.) The Supreme Court emphasized that "only in 'circumstances of that magnitude'" will it dispense with the prejudice requirement. (Ibid.) In Doolin, the California Supreme Court agreed with this limitation on the use of the presumption of prejudice. (Doolin, supra, 45 Cal.4th at p. 418.)

Gonzales's argument does not suggest a circumstance of the magnitude similar to a defendant deprived of counsel. Nor is this a dual representation case where trial counsel was attempting to represent two defendants with conflicting defenses. Gonzales never was deprived of counsel, and nothing in the record suggests trial counsel operated under a conflict of interest or did anything (or failed to do something) in order to

protect one of the witnesses his office apparently represented. All of the matters were unrelated to the charges against Gonzales. Nor is there anything in the record to suggest that trial counsel had any involvement in representing these witnesses. Finally, there is nothing to suggest that trial counsel obtained any confidences from any of the witnesses.

A presumption of prejudice will be utilized only in the most egregious of cases. While we cannot identify every situation where a defendant is entitled to a presumption of prejudice, it is clear this is not such a situation.

People v. Gonzales, 2011 Cal. App. Unpub. LEXIS 6079 (Cal. App. 5th Dist. Aug. 11, 2011).

## 2.    Relevant Federal Law

The Sixth Amendment right to the effective assistance of counsel includes a correlative right to representation free of conflicts of interest. See Wood v. Georgia, 450 U.S. 261, 271, 101 S. Ct. 1097, 1103, 67 L. Ed. 2d 220 (1981). To establish a violation of the Sixth Amendment right to conflict-free counsel, a defendant must show that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S. Ct. 1708, 1719, 64 L. Ed. 2d 333 (1980). For Sixth Amendment purposes, an "actual conflict" is a conflict of interest that "adversely affects counsel's performance." Mickens v. Taylor, 535 U.S. 162, 172 n.5, 122 S. Ct. 1237, 1244 n.5, 152 L. Ed. 2d 291 (2002). "[A] mere theoretical division of loyalties" is not enough. Id. at 171, 122 S. Ct. at 1244. The Ninth Circuit has stated that, to demonstrate an actual conflict resulting in an adverse effect, the defendant must demonstrate "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." Hovey v. Ayers, 458 F.3d 892, 908 (9th Cir. 2006) (quoting United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005)). If a defendant shows an actual conflict of interest under these standards, prejudice is presumed. Cuyler, 446 U.S. at 349-50, 100 S. Ct. at 1719.

To show an adverse effect, a petitioner must show "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was . . . not undertaken due to the attorney's other loyalties." United

1    States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005) (internal quotation omitted); see also

2    United States v. Shwayder, 312 F.3d 1109, 1118 (9th Cir. 2002) ("To show that an actual

3    conflict had an adverse effect, . . . the defendant must establish that counsel was

4    influenced in his basic strategic decisions by the [conflicting] interests.") (internal

5    quotation marks and citation omitted).

6            3.      Analysis

7                a.      Economic Conflict With Counsel's Employer

8            First, Petitioner alleges a conflict of interest created by trial counsel's relationship

9    with the public defender's office which employed him. (Pet. at 4.) Petitioner alleges that

10   counsel's employer did not allow counsel to take certain actions that would have been

11   beneficial to Petitioner's defense, but instead allowed his supervisors at the public

12   defender's office make decisions regarding potential expenditures. (Id.) Further,

13   Petitioner asserts that counsel's supervisor or the policies of the public defender's office

14   "trumped" counsel's judgment with regard to decisions in the case. (Id. at 31-32.)

15           Petitioner describes several examples of decisions that were impacted by the

16   public defender's office. Notably, Petitioner explained that counsel had to obtain

17   permission to rent a car to interview a witness out of county because counsel was

18   normally assigned a natural gas car that he was not allowed to drive out of the county.

19   (See Pet. at 197-198.) Petitioner also asserts that his counsel was not able to hire

20   investigators to retrieve case files from Petitioner's prior counsel who withdrew from

21   representation and moved to Florida on being diagnosed with cancer. Finally, Petitioner

22   claims that the public defender's office would not pay the remaining fee for an expert

23   forensic anthropologist, Dr. Murrad, retained by Petitioner's first attorney. (Id. at 187-88.)

24           While there may have been disputes between Petitioner's counsel and counsel's

25   office regarding expenditure or resources, Petitioner has not presented any evidence of

26   an actual or perceived conflict. The decision to allocate resources is always complex,

27   and counsel is not necessarily ineffective in deciding to conserve financial resources.

28   Attorneys constantly have to decide how much time and resources to devote to a case.

1  The failure to take every option available to attempt to present a defense will rarely

2  subject the attorney to a finding of ineffectiveness so long as he used his professional

3  judgment in deciding which option to pursue. Here, there might have been

4  disagreements between counsel and his supervisors, but Petitioner indicates only that

5  there might have been difficulties in obtaining necessary funding, not that funding and

6  actions were denied.

7       For example, with regard to the expert witness, Dr. Murad, regardless of any

8  disputes over payment, he was called as a witness by, and testified favorably to,  the

9  defense at trial. (See Rep. Tr.  at 741-804.) Specifically, he testified  that the victim's

10 body had been submerged in water for a much longer period than alleged by the

11 prosecution. Accordingly, any alleged conflict of interest in paying for an expert appears

12 harmless.

13      With regard to investigating out of county witnesses, counsel noted that he

14 routinely needed permission to have an investigator do so or to rent a car capable of

15 traveling out of  county. (Pet. at 197-198.) However, at no time did counsel state that he

16 was denied permission, or otherwise was unable to contact relevant witnesses prior to

17 trial.

18      While financial restrictions of the public defender's office may have been

19 burdensome, Petitioner has not made a showing "that some plausible alternative

20 defense strategy or tactic might have been pursued but was not, and that the alternative

21 defense was inherently in conflict with or not undertaken due to the attorney's other

22 loyalties or interests." Hovey, 458 F.3d at 908. As Petitioner as not described any

23 defense strategy that counsel was unable to undertake, Petitioner has not met his

24 burden of showing that any conflict of interest regarding financial arrangements

25 impacted his representation.

26      Petitioner has presented several other related arguments in his first claim. He

27 asserts that counsel was ineffective for failing to make a record of other polices of the

28 public defender's office that inhibited his representation. (Pet. at 54-55.) Petitioner cites

1   a conversation during his <u>Marsden</u> hearing where counsel informed the Court that there

2   was a dispute in his office regarding potential conflict and that Petitioner's prior counsel

3   felt strongly that there was a conflict. (Pet. at 199.) The statements made by counsel are

4   vague at best, and do not sufficiently describe the conflict at issue and how it or any

5   other conflict could have impaired his representation. Petitioner is not entitled to relief

6   based on the failure of his counsel to make a sufficient record of conflicts.

7        Petitioner next argues that a conflict of interest existed based on budget cuts at

8   the public defender's office that limited the number of investigators. While Petitioner

9   asserts that it was a lack of staffing that prevented defense counsel from conducting

10  interviews of witnesses, during the <u>Marsden</u> hearing, counsel noted that an investigator

11  or process servers attempted to find the witnesses but many were not able to be found.

12  (Pet. at. 197.) Petitioner asserts that the investigator failed to interview Petitioner's ex-

13  wife, who would present an alibi that Petitioner never left the party. (Pet. at 59-60.) While

14  Petitioner asserts that counsel failed to interview his ex-wife based on lack of

15  investigative support, counsel explained at the hearing that he did not interview her

16  because he believed that she was not present at the party on the night in question. (Pet.

17  at 200.) Accordingly, Petitioner has not shown that a reduction in the number of

18  investigators at the public defender's office caused defense counsel to limit his

19  investigation or otherwise had any detrimental effect on Petitioner's defense.

20       The state court decision was neither contrary to, nor an unreasonable application

21  of, clearly established Supreme Court law, nor was its decision based on an

22  unreasonable determination of the facts. Accordingly, Petitioner is not entitled to relief

23  with regard to his first claim.

24                     b.        Constructive Denial of Counsel

25       In his second claim, Petitioner asserts that he was constructively denied counsel

26  at three critical stages of trial – (i) in determining whether defense counsel created a

27  conflict by remaining in the case, (ii) during the investigation, and (iii) during the <u>Marsden</u>

28  hearings when Petitioner requested new counsel. (Pet. at 64-68.)

1   Petitioner contends that counsel was ineffective for not providing effective
2   advocacy during certain portions of trial. Petitioner asserts that counsel was conflicted in
3   the matter because decisions of his supervisors may have impacted his decision
4   regarding the amount of resources to use. This argument is duplicative of the argument
5   presented in claim one. As previously described, every attorney must take into
6   consideration financial concerns with regard to presenting a defense. Moreover,
7   Petitioner has not identified any actions that counsel should have taken but did not
8   because of financial restrictions by his supervisors. Counsel presented rebuttal
9   witnesses, including a forensic expert, and otherwise attempted to present an adequate
10  defense. Petitioner has not shown that counsel failed to conduct a proper investigation
11  or that his conduct otherwise fell below professional norms.

12  Petitioner also asserts that counsel abandoned him during the <u>Marsden</u> hearings
13  in which he sought new counsel.  Petitioner is unable to show counsel's conduct at the
14  hearings was deficient or otherwise caused Petitioner prejudice. Petitioner was able to
15  present his arguments regarding counsel's failings to the judge, and, at times, counsel
16  helped describe Petitioner's arguments to the court. (<u>See e.g.</u>, Lodged Doc. 16 at 1098-
17  1099.) Petitioner has not shown that counsel had an actual conflict of interest, fell below
18  an objective level of conduct, or that Petitioner was prejudiced by counsel's actions.
19  Petitioner is not entitled to relief with regard to his second claim for relief.

20          c.      Conflict of Interest – Prior Representation of Witnesses

21  Next, Petitioner contends that his trial attorney had a conflict of interest based on
22  the fact that the public defender's office had previously represented nearly all of the
23  witnesses in the case. (Pet. at 69-71.) "In order to demonstrate a violation of his Sixth
24  Amendment rights, a defendant must establish that an actual conflict of interest
25  adversely affected his lawyer's performance." <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 350, 100
26  S. Ct. 1708, 64 L. Ed. 2d 333 (1980). The mere possibility of a conflict, however, is
27  insufficient. <u>Id.</u>; <u>Mickens v. Taylor</u>, 535 U.S. 162, 173, 122 S. Ct. 1237, 152 L. Ed. 2d
28  291 (2002). The Ninth Circuit has found that the Sixth Amendment is not violated "when

1   a defendant is represented by a lawyer free of actual conflicts of interest, but with whom

2   the defendant refuses to cooperate because of dislike or distrust. Plumlee v. Masto, 512

3   F.3d 1204, 1211 (9th Cir. 2008). In the absence of any record evidence as to the

4   existence of an actual conflict of interest, a district court is correct to reject a claim of

5   conflict. Morris v. California, 966 F.2d 448, 456 (9th Cir. 1992).

6        Petitioner complains that his trial attorney had access to confidential information

7   from the public defender's office files of several witnesses, and that several of the

8   witnesses were currently in court facing separate criminal charges. (Pet. at 69-71.)

9   Petitioner asserts that the fact that counsel's office represented witnesses at prior

10   proceedings created a conflict that adversely affected counsel's performance. Petitioner

11   has not presented substantial evidence to support his claim. Petitioner cites to California

12   Rule of Professional Conduct, Rule 3-310 that counsel cannot accept representation

13   without written consent when adverse representation may lead to the attorney obtaining

14   confidential information material to the employment. However, here, Petitioner cannot

15   show that any confidential information was obtained or that the prior representation of

16   any of the witnesses by counsel's office adversely affected his representation of

17   Petitioner. Petitioner has not explained what information or actions counsel undertook

18   based upon information contained in witness files. Information obtained in prior cases

19   involving witnesses would not contain confidential information about Petitioner or his

20   case. While the public defender's office may have represented witnesses in other

21   proceedings, Petitioner has not shown that the prior representation created actual

22   conflicts of interest with counsel's representation of Petitioner.  Furthermore, Petitioner

23   has failed to prove, through a factual showing on the record, that any alleged conflict

24   adversely affected counsel's performance.

25        Counsel performed significant investigation, and Petitioner has not shown that his

26   investigation was hindered or affected by a direct conflict of interest. The state court's

27   rejection of the claim was neither contrary to nor an unreasonable application of Federal

28   law. Petitioner's claim of ineffective assistance of counsel based on conflict of interest is

1    without merit.

2                    d.     Denial of Request for Substitute Counsel

3          Where a defendant is proceeding with the assistance of counsel, he may move to

4    dismiss or substitute counsel, whether appointed or retained. The grant or denial of such

5    a motion may depend on its timeliness and the nature of the conflict between the

6    defendant and current counsel. United States v. Musa, 220 F.3d 1096, 1102 (9th Cir.

7    2000). In assessing on direct appeal a federal trial court's decision to deny a motion for

8    substitute counsel, three factors are to be considered: "(1) the timeliness of the motion

9    and the extent of resulting inconvenience or delay; (2) the adequacy of the court's inquiry

10   into the defendant's complaint; and (3) whether the conflict between the defendant and

11   his attorney was so great that it resulted in a total lack of communication preventing an

12   adequate defense." Id. The trial court's inquiry into a criminal defendant's complaints

13   about his trial counsel must be "adequate to create a sufficient basis for reaching an

14   informed decision." United States v. Mendez-Sanchez, 563 F.3d 935, 942-943 (9th Cir.

15   2009) (quoting Musa, 220 F.3d at 1102 (quotation omitted)).

16         However, the Ninth Circuit has also ruled that in assessing such a claim in the

17   context of a § 2254 proceeding such as this, the focus is different than that on direct

18   review. In Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) (en banc) the court stated:

19             Our primary reason for accepting this case for en banc review was
20        to correct the standard of review we have been using to examine the
          constitutionality of a state court's handling of a motion to substitute
21        appointed counsel based on allegations of an irreconcilable conflict. In
          Bland, we said that the test is whether a state court's denial of such a
22        motion was for an "abuse of discretion." Bland, 20 F.3d at 1475.

               * * *

23

24             [O]ur only concern when reviewing the constitutionality of a state-
          court conviction is whether the petitioner is "in custody in violation of the
25        Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).
          See also Coleman v. Thompson, 501 U.S. 722, 730, 111 S. Ct. 2546, 115
26        L. Ed. 2d 640 (1991) ("The [habeas] court does not review a judgment but
          the lawfulness of the petitioner's custody simpliciter.") A particular abuse
27        of discretion by a state court may amount also to a violation of the
          Constitution, but not every state court abuse of discretion has the same
28        effect. Accordingly, to the extent that they conflict with this opinion, we
          overrule Bland and Crandell v. Bunnell, 144 F.3d 1213 (9th Cir. 1998).

                                              23

1   218 F.3d at 1024-25 (footnotes omitted). The court in <u>Schell</u> determined that it was "well

2   established and clear that the Sixth Amendment requires on the record an appropriate

3   inquiry into the grounds of [a motion for substitute counsel], and that the matter be

4   resolved on the merits before the case goes forward." <u>Id.</u> at 1025. <u>See also</u> <u>Hudson v.</u>

5   <u>Rushen</u>, 686 F.2d 826, 829 (9th Cir. 1982) ("Thus, the state trial court's summary denial

6   of a defendant's motion for new counsel without further inquiry violated the Sixth

7   Amendment.").

8       Here, Petitioner made several requests for substitution of counsel during trial. The

9   trial court heard Petitioner's requests and complaints and denied the requests. (Lodged

10  Doc. 16.)

11      In reviewing Petitioner's claims, the trial court noted that many of the issues were

12  raised were inherent problems with the case, and not based on the actions of counsel.

13  With regard to the failure to investigate or call alibi witnesses, the court noted that the

14  real problem was that many of the witnesses suffered from credibility problems due to

15  drug use. (Lodged Doc. 16 at 1104.) The court explained that it would not have mattered

16  which side called any of the witnesses, and that counsel did "everything he could and

17  bent over backwards to do it." (<u>Id.</u>)

18      As the trial court provided Petitioner an opportunity to be heard and it deliberated

19  regarding his claims, the court's handling of the motions to substitute counsel in this

20  case passes constitutional muster. <u>Schell</u>, 218 F.3d at 1025. Petitioner does not contend

21  that he was not heard, only that the trial court was not persuaded by his arguments.

22  Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a

23  decision that was contrary to, or involved an unreasonable application of, clearly

24  established Federal law, as determined by the Supreme Court of the United States." 28

25  U.S.C. § 2254(d). Accordingly, the claim should be denied.

26      **B.    <u>Claim 5: Due Process Violation for Failure to Grant Continuance</u>**

27      Petitioner, in his fifth claim, asserts that the trial court violated his due process

28  rights by denying a continuance prior to sentencing to allow Petitioner to retain new

24

counsel.

## 1.   State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 1, 6.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the California Court of Appeal explained:

III. Denial of Request to Continue the Sentencing Hearing

> Gonzales's sentencing hearing occurred two weeks after Gonzales's final Marsden motion was denied. The trial court first heard Gonzales's motion to obtain juror identification information because of alleged juror misconduct. The trial court concluded there was no evidence of misconduct and denied the motion.

> Once the sentencing hearing was commenced, Gonzales requested, for the first time, a continuance to allow his family to hire an attorney to file a motion for a new trial. The trial court denied the request. Gonzales argues the trial court erred in doing so.

> Continuances in a criminal case may be granted only upon a showing of good cause. (§ 1050, subd. (e); People v. Frye (1998) 18 Cal.4th 894, 1012, disapproved on other grounds in Doolin, supra, 45 Cal.4th at p. 421, fn. 22.) A showing of good cause requires a demonstration that both counsel and the defendant have used due diligence in their preparations. (People v. Jenkins (2000) 22 Cal.4th 900, 1037.) "The determination of whether a continuance should be granted rests within the sound discretion of the trial court." (People v. Sakarias (2000) 22 Cal.4th 596, 646.) Absent a showing of abuse of discretion and prejudice to the defendant, the denial of a motion for continuance does not require reversal. (People v. Samayoa (1997) 15 Cal.4th 795, 840.) Gonzales cannot establish either abuse of discretion or prejudice.

> The trial court did not abuse its discretion because Gonzales did not establish good cause for a continuance. Gonzales asserted his family was considering hiring a new attorney to file a motion for a new trial, but this assertion came almost four months after he was found guilty. Gonzales seeks to excuse this delay because his motion came only two weeks after his final Marsden motion was denied. Yet there is no reason why the Marsden motion was not filed immediately after the verdict was rendered. Nor is there any reason why the issue was not addressed immediately after the Marsden motion was denied. Instead, the facts of

25

1    this case strongly suggest that Gonzales simply was attempting to delay
     sentencing using every tactic at his disposal.

2         Also, Gonzales had not retained new counsel, but simply stated his
3    family might do so. This equivocation establishes the lack of good cause
     for the motion. If Gonzales was convinced a new attorney should be
4    retained and a motion for new trial filed, he would have made sure the
     new attorney was present to explain why he should be allowed to enter
5    the case.

6         Gonzales attempts to insert his Sixth Amendment right to counsel
     of his choosing into this argument. We reject this attempt. The trial court
7    did not refuse to permit Gonzales the right to retain counsel of his choice.
     As explained above, there is no indication that Gonzales had spoken with
8    another attorney about representing him. Instead, the request was to
     delay sentencing to some indefinite date in the future to allow some
9    unidentified attorney to be retained if Gonzales's family could obtain
     enough money to do so. There is no indication in the record that anyone
10   had been consulted or what steps, if any, Gonzales's family had taken to
     obtain the necessary funds. This rather vague and untimely request was
11   not good cause for a continuance.

12        Nor can Gonzales establish that he suffered any prejudice as a
     result of the denial of his motion. At the time of the motion, the trial was
13   complete and the only issue was sentencing. Gonzales does not suggest
     that a new attorney could have altered the outcome of the sentencing
14   hearing. Instead, he argues that a new attorney would have filed a motion
     for a new trial, based, once again, on the alleged conflict of interest trial
15   counsel had because of the public defender's representation of several
     trial witnesses. This contention has been thoroughly addressed in this
16   opinion and rejected. To the extent Gonzales may be suggesting that
     evidence not included in the appellate record could have been presented
17   at the new trial motion, he may pursue that avenue in a writ proceeding if
     such evidence exists.

18   People v. Gonzales, 2011 Cal. App. Unpub. LEXIS 6079 at 28-32.

19        2.    Legal Standard

20   Trial courts are accorded broad discretion on matters regarding continuances.

21   Morris v. Slappy, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983);

22   Hernandez v. Holland, 750 F.3d 843, 858 (9th Cir. 2014). While there are "no

23   mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate

24   due process," Ungar v. Sarafite, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921

25   (1964), the Ninth Circuit has identified several factors relevant in determining whether

26   the trial court abused its discretion in denying a requested continuance. See Armant v.

27   Marquez, 772 F.2d 552, 556-57 (9th Cir. 1985) (identifying the following factors: the

28   degree of diligence by the petitioner prior to seeking the continuance; whether the

1    continuance would have served a useful purpose; the inconvenience that the

2    continuance would have caused the court or the government; and the amount of

3    prejudice suffered by the petitioner). "At a minimum, however, in order to succeed the

4    [petitioner] must show some prejudice resulting from the court's denial." Id.

5            3.      Analysis

6        The trial court's denial of Petitioner's motion to continue was not so arbitrary as to

7    violate due process.  Petitioner has not shown that he was prejudiced in any way by the

8    trial court's exercise of discretion.  Petitioner was not prejudiced by the trial court's denial

9    of his motion to continue sentencing because he had over three months after his

10   conviction to seek new counsel, but had failed to do so. Because Petitioner has not

11   shown prejudice, he has not established that the trial court's denial of his continuance

12   motion was so arbitrary as to violate due process. Petitioner is not entitled to relief with

13   regard to this claim.

14   **C.    Double Jeopardy: Claim 6**

15       Petitioner, in his final claim, asserts that the application of the sentence

16   enhancement for the use of a firearm during the commission of the murder constituted

17   double jeopardy.

18           1.      State Court Decision

19       Petitioner presented this claim by way of direct appeal to the California Court of

20   Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

21   appellate court and summarily denied in subsequent petition for review by the California

22   Supreme Court. (See Lodged Docs. 1, 6.) Because the California Supreme Court's

23   opinion is summary in nature, this Court "looks through" that decision and presumes it

24   adopted the reasoning of the California Court of Appeal, the last state court to have

25   issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

26       In denying Petitioner's claim, the California Court of Appeal explained:

27           The trial court sentenced Gonzales to a term of 25 years to life for
             the first degree murder conviction and a consecutive term of 25 years to
28           life for the gun use enhancement pursuant to section 12022.53,

1
2

subdivision (d). This sentence is consistent with the terms of the applicable statutes. Nonetheless, Gonzales argues that the trial court erred in imposing both the sentence for the crime and the sentence for the enhancement.

3
4
5

Gonzales concedes that his argument has been rejected by the California Supreme Court (People v. Sloan (2007) 42 Cal.4th 110, 115-123; People v. Izaguirre (2007) 42 Cal.4th 126, 130-134), and we are bound by its decisions (Auto Equity Sales v. Superior Court (1962) 57 Cal.2d 450, 455). Accordingly, we reject his argument.

6    People v. Gonzales, 2011 Cal. App. Unpub. LEXIS 6079 at 32.

7              2.     Analysis

8    The Fifth Amendment guarantee against double jeopardy (which is enforceable

9    against the States through the Fourteenth Amendment) consists of three separate

10   constitutional protections: (1) a second prosecution for the same offense after acquittal;

11   (2) a second prosecution for the same offense after conviction; and (3) multiple

12   punishments for the same offense. See United States v. Halper, 490 U.S. 435, 440, 109

13   S. Ct. 1892, 104 L. Ed. 2d 487 (1989). A state, however, may punish separate offenses

14   arising out of the same transaction without violating the double jeopardy clause. See

15   Albernaz v. United States, 450 U.S. 333, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981).

16   Under Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932),

17   in determining whether separate punishment might be imposed for a single transaction

18   or act, the critical issue is whether each statutory provision "requires proof of a fact that

19   the other does not," "notwithstanding a substantial overlap in the proof offered to

20   establish the crimes." Albernaz, 450 U.S. at 337-38 (internal quotation marks omitted);

21   see also Rutledge v. United States, 517 U.S. 292, 297, 116 S. Ct. 1241, 134 L. Ed. 2d

22   419 (1996).

23   Moreover, the Double Jeopardy Clause does not limit a legislature from

24   specifically authorizing cumulative punishment under two statutes. See Hunter, 459 U.S.

25   at 368 (concluding that "simply because two criminal statutes may be construed to

26   proscribe the same conduct under the Blockburger test does not mean that the Double

27   Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments

28   pursuant to those statutes"). Rather, the Supreme Court has held that, "[w]ith respect to

1    cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no

2    more than prevent the sentencing court from prescribing greater punishment than the

3    legislature intended." Id. at 366. Thus, "[w]here two statutory provisions proscribe the

4    'same offense,' they are construed not to authorize cumulative punishments in the

5    absence of a clear indication of contrary legislative intent." Id. at 367 (emphasis omitted)

6    (quoting Whalen v. United States, 445 U.S. 684, 692, 100 S. Ct. 1432, 63 L. Ed. 2d 715

7    (1980)).

8        The California state legislature intended that the punishment for the sentence

9    enhancement set forth in Penal Code § 12022.53 be imposed in addition to the

10   punishment for the underlying substantive offenses. See, e.g., People v. Palmer, 133

11   Cal. App. 4th 1141, 1152, 35 Cal. Rptr. 3d 373 (2005) ("The legislative purpose behind

12   the statute is unambiguous: to impose substantially longer prison sentences . . . on

13   felons who use firearms in the commission of their crimes, in order to protect our citizens

14   and to deter violent crime." (internal quotation marks omitted)). In People v. Hutchins, 90

15   Cal. App. 4th 1308, 109 Cal. Rptr. 2d 643 (Cal. Ct. App. 2001), a California Court of

16   Appeal stated:

17           What the Legislature has done by enacting section 12022.53 is not to
             punish the same single criminal act more than once or in more than one
18           way. Instead, in determining that a criminal offender may receive
             additional punishment for any single crime committed with a firearm, the
19           Legislature has chosen to enhance or expand the punishment imposed on
             a single underlying crime, where committed by use of a firearm, in order to
20           deter a particular form of violence judged especially threatening to the
             social fabric.
21

22   Id. at 1313-14; see also Plascencia v. Alameida, 467 F.3d 1190, 1204 (9th Cir. 2006)

23   (rejecting, on habeas review, a double jeopardy claim for imposition of a gun

24   enhancement pursuant to § 12022.53 and finding that it is clear that the California

25   legislature intended that "a criminal offender may receive additional punishment for any

     single crime committed with a firearm").
26

27       To the extent that Petitioner relies on Apprendi v. New Jersey, 530 U.S. 466, 120

28   S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and Sattazahn v. Pennsylvania, 537 U.S. 101,

123 S. Ct. 732, 154 L. Ed. 2d 588 (2003), for the proposition that the Supreme Court had abandoned its holding in <u>Hunter</u>, his reliance is misplaced. The Ninth Circuit has recently rejected such argument:

> <u>Apprendi</u>, [<u>Texas v. Cobb</u>, 532 U.S. 162, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001)], and <u>Sattazahn</u>—whether considered individually or together—did not create "clearly established Federal law" requiring a state court to consider sentencing enhancements as an element of an offense for purposes of the Double Jeopardy Clause. A state court cannot be expected—much less required—to refer to federal law which is not clearly established. Thus, we hold the state court's decision was not "contrary to, or an unreasonable application of, clearly established Federal law." The Supreme Court has not squarely addressed this issue and fairminded jurists could disagree as to the constitutional principle.

<u>Smith v. Hedgpeth</u>, 706 F.3d 1099, 1106 (9th Cir. 2013).

Moreover, even if Supreme Court law established that a sentencing enhancement constitutes an element of the underlying offense for the purpose of barring punishment on a different count, as was advocated in <u>Smith</u>, it would not follow that punishment for an enhancement should bar punishment for the underlying crime, when such cumulative punishment was the clear intent of the legislature. Petitioner has cited no law, nor does this Court know of any, that alters <u>Hunter</u>'s holding that "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." 459 U.S. at 366. Finally, in <u>Plascencia</u>, which post-dates both <u>Sattazahn</u> and <u>Apprendi</u>, the Ninth Circuit rejected a double jeopardy claim identical to Petitioner's. <u>See Plascencia</u>, 467 F.3d at 1204.

Based on the determination by the California courts that the California legislature intended to provide cumulative punishment for an underlying crime where a gun was used, this Court has no basis for concluding that the California courts' rejection of Petitioner's double jeopardy claim was either contrary to or based on an unreasonable application of clearly established federal law. Petitioner's double jeopardy arguments do not warrant habeas relief.

## IV.    RECOMMENDATION

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, __ F.3d __, __, No. 11-17911, 2014 WL 6435497, at *3 (9th Cir. Nov. 18, 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   December 22, 2014          /s/ Michael J. Seng

UNITED STATES MAGISTRATE JUDGE

31